1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

LUIS RAUL ESPINOSA-CISNEROS,    )
                )
        Petitioner,    )    Case No. 2:16-cv-00057-GMN-CWH
                )
vs.                )    **REPORT & RECOMMENDATION**
                )
MARIANELA SOLIS-LOPEZ,      )
                )
        Respondent.   )
_____)

       Presently before the court is Petitioner Luis Raul Espinosa-Cisneros's Second Amended Petition for Return of Children to Petitioner (ECF No. 27) under the Hague Convention on the Civil Aspects of International Child Abduction, filed on March 25, 2016.  Respondent Marianela Solis-Lopez filed an answer (ECF No. 31) on April 1, 2016.  The court held a three-day evidentiary hearing regarding the second amended petition on May 17, May 18, and June 15, 2016.  (Mins. of Proceedings (ECF Nos. 51, 52, 62).)[1]  In lieu of a fourth day of testimony, the parties agreed to file witness declarations.  Petitioner filed two witness declarations.  (Decl. of Maria Guadalupe Cisneros Nova (ECF No. 64); Decl. of Luis Raul Espinosa Cisneros (ECF No. 66).)  Respondent filed one witness declaration.  (Decl. of Laura Gabriela Solis Lopez (ECF No. 65).)  Respondent filed an objection (ECF No. 70) to Petitioner's witnesses' declarations on July 8, 2016.  Petitioner filed an errata (ECF No. 71) to his declaration on July 12, 2016.  Respondent filed an errata (ECF No. 74) to Laura Gabriela Solis Lopez's declaration on July 19, 2016.

       Also before the court is Petitioner's post-hearing brief (ECF No. 72), filed on July 18, 2016.  Respondent filed a response (ECF No. 78) on July 28, 2016.

_____

    [1] At the hearing, the court admitted into evidence Petitioner's exhibits 1-8 and 10-13 and Respondent's exhibits A-I.  Petitioner's exhibit 9 was admitted only as to pages 14 and 60.

1    Also before the court is Respondent's post-hearing brief (ECF No. 73), filed on July 18,

2    2016.  Petitioner filed a response (ECF No. 77) on July 28, 2016.

3    **I.     FINDINGS OF FACT**

4         The parties are familiar with the facts of this case and the court will not repeat them here

5    except where necessary.  The court heard extensive testimony at the three-day evidentiary hearing,

6    much of which would go to the merits of a child custody case.  The ultimate issue before the court

7    is not who, as between the parties, is best suited to have custody of the children—it is to determine

8    which court has jurisdiction to determine custody.  Given that this recommendation is not a

9    determination of the merits of any custody issues within the meaning of the Hague Convention, the

10   court will limit its factual findings to the issues that bear on Petitioner's case-in-chief for return and

11   Respondent's grave-risk defense and mature child objection to return.

12        Petitioner, Respondent, and their daughters—AVES[2] who is nine years old and AIES who is

13   two years old—are all Mexican citizens.  (Tr. (ECF No. 67) at 13-14; Ex. 1 (birth certificates

14   indicating the children were born in Uruapan, Michoacan, Mexico.))  Petitioner and Respondent

15   met in 2005 when they were high school students.  (Tr. (ECF No. 69) at 5.)  They began

16   experiencing relationship problems while they were dating, which Respondent contends were

17   caused by Petitioner's jealousy about other men.  (Tr. (ECF No. 69) at 5-6.)  Regardless, the parties

18   were married on May 13, 2006, in Uruapan.  (Tr. (ECF No. 67) at 12; Ex. 2.)

19        Shortly after their wedding, the parties moved to Cancun, Mexico, to live with Petitioner's

20   family.  (Tr. (ECF No. 69) at 6-7.)  Respondent testified that at the beginning of their marriage,

21   they would have good days and bad days.  (*Id.* at 7-8.)  On the bad days, Petitioner would insult

22   Respondent and kick her out of the bed, resulting in Respondent either sleeping on the floor or in

23   her in-laws' room.  (*Id.* at 8.)  Respondent testified that while they were living in Cancun,

24   Petitioner pushed Respondent off the bed, causing back and kidney pain.  (*Id.*)  When she was

25   examined by a doctor for the pain, she learned she was pregnant with AVES.  (*Id.*)  Respondent

26   _____

27       [2] The court refers to the minor children by their initials to protect their identities.  *See* Fed. R.
     Civ. P. 5.2(a)(3); LR IC 6-1(a)(2) ("If the involvement of a minor child must be mentioned, only the

28   initials of that child should be used.")

2

testified that although Petitioner was happy about the pregnancy, he also blamed Respondent for the fact that he was not going to be able to continue school and called her a "bitch" and an "idiot." (*Id.* at 9.) Respondent testified that while she was pregnant with AVES, Petitioner hit her on the arms and head, "[m]aybe once a week, maybe every third day when he got upset when he would throw me off bed or push me out of the room," resulting in bruises on her arms. (*Id.* at 9-11.)

According to Respondent, various incidents of domestic violence occurred after AVES was born. Respondent testified that when AVES was approximately eight months old, Petitioner lifted Respondent from the ground by the neck and choked her. (*Id.* at 12-13.) When AVES was in preschool or kindergarten, there was an incident in which AVES wanted to sleep in the parties' bed but Petitioner would not allow it, causing AVES to cry. (*Id.* at 15.) According to Respondent, Petitioner became angry and took AVES to a dark hallway that served as a kitchen and laundry room, where he was screaming at her and shaking her. (*Id.* at 15-16.) Respondent was afraid Petitioner was physically hurting AVES, so she tried to hit him in the back and take him off AVES, but he fought her off. (*Id.* at 17.)

Respondent also testified regarding domestic violence during and after her pregnancy with AIES. Respondent testified that when she was two and a half months pregnant with AIES, Petitioner tried to push her off the second-floor balcony in their apartment building. (*Id.* at 27.) When she strained herself to avoid falling and asked for help, he grabbed her by the hair and pulled her into their apartment. (*Id.*) According to Respondent, AVES witnessed the incident on the balcony. (*Id.*) Although the time line is somewhat unclear, the court understood Respondent's testimony to be that after AIES was born, Petitioner pushed Respondent in the dining room, causing her c-section incision to open. (*Id.* at 33.)

Respondent also testified regarding threats of violence to her and the children. When AVES was in kindergarten or first grade, while the family was on a camping trip, Petitioner threatened to kill Respondent. (*Id.* at 19-21.) Specifically, while they were hiking on a hill in the forest,

/ / /

/ / /

3

[h]e said that he could just kill me and bury me there and nobody would ever find me. He said that he could chop me into pieces and leave me—leave the pieces all over the place around the hill. He also said that he could feed those pieces to the dogs. There was an area there where an airplane from Taesa fell, and there was still human remains all over. So he said that nobody would think anything if I was left there.

(*Id.* at 20.) Respondent stated that when AVES became afraid and asked why Petitioner was saying those things, Respondent tried to deflect from the threats by telling AVES that Petitioner was talking about a horror movie. (*Id.*) According Respondent, Petitioner replied "[n]o, this is real. This is something that I can do and I can do that to you as well." (*Id.*)

Respondent further testified that Petitioner threatened to "amputate [her] hand or [her] tongue or any other extremity so [she] would no be happy with him or with anybody ever again." (*Id.* at 22.) Respondent testified that on other occasions, including when she was pregnant with AIES, Petitioner would instruct AVES to hit, step on, or throw balls at Respondent, or else he would threaten to hit AVES. (*Id.* at 17-19.) Additionally, Respondent testified that Petitioner threatened to kill AIES. (*Id.* at 23-24.) Respondent stated that because she previously had been unfaithful to Petitioner, he speculated that AIES was not his daughter. (*Id.*) While Respondent was pregnant with AIES, "[Petitioner] would often say that he was going to pay a doctor so at the time of the birth he would kill me and her, and it would [] look like an accident." (*Id.* at 23.) Respondent does not want to return to Mexico "from fear because of the death threat that [she] know[s] [Petitioner] will carry out." (*Id.* at 90.)

Respondent testified that she reported the abuse to the Mexican authorities in Uruapan November of 2013, but that no action was taken regarding her report because Petitioner did not appear in the case and because Petitioner's uncle works for the district attorney's office. (*Id.* at 34-36.) Although it is somewhat unclear, it appears she may have attempted to go to a safe house for women: "[a]nd one time I had to go to a facility. I don't remember the name of it, but it's a facility for women and I even brought some psychological tests from therapy, and nothing." (*Id.* at 34-35.)

AVES testified that her father hit her three or four times. (Tr. (ECF No. 68) at 11, 30.) On one occasion, AVES explained that she wanted to sleep in her parents' bed but that Petitioner would not let her and became upset when she started screaming and refused to obey. (*Id.* at 31-32.)

4

Petitioner then took her to a dark laundry room, where he hit her again because she would not stop crying. (*Id.* at 12-13.) Petitioner locked AVES inside the laundry room all night. (*Id.* at 32.) Another time, Petitioner hit AVES on the shoulder because she was misbehaving at his place of employment. (*Id.* at 30-31.) The last time that Petitioner hit her, AVES had attempted to intervene in a fight between the parties and Petitioner hit her with the back of his hand, causing her lip to split. (*Id.* at 11-12, 33-34.)

AVES also testified that she saw Petitioner hit Respondent, causing her nose to bleed on two occasions. (*Id.* at 14.) AVES stated that Petitioner hit Respondent was because he did not like her cooking. (*Id.* at 15, 43-44.) AVES stated that while Respondent was pregnant with AIES, AVES saw Petitioner push Respondent into a mirror, causing it to break. (*Id.* at 16.) Another time while Respondent was pregnant, AVES saw Petitioner hit Respondent in the stomach, resulting in Respondent having to go to the hospital. (*Id.*) AVES testified that she had seen Petitioner hit Respondent in the head, but that she could not recall a specific occasion. (*Id.* at 17.) AVES stated she had witnessed Petitioner hit Respondent more than one hundred times. (*Id.* at 29.)

AVES testified that when they were on a family camping trip, Petitioner threatened to kill her, AIES, and Respondent. (*Id.* at 9-10, 36-38.) AVES testified that she is afraid of her father. (*Id.* at 15.) AVES also testified that she is afraid of the dark and that she has nightmares "[a]bout my dad killing my mom." (*Id.* at 13.) When asked whether she feels safe living in Mexico, AVES testified that "I'm scared that my dad [sic] kill my mom." (*Id.* at 9.) AVES objects to being returned to Mexico and wants to stay in the United States. (*Id.* at 10, 18.) AVES states that she wants to protect her mother. (*Id.* at 35.) AVES does not want to speak to her father on the telephone because she is "scared that he knows where I am and he comes and does like something to my mom." (*Id.* at 28.) According to AVES, she told her paternal grandmother about her father's behavior two times. (*Id.* at 47.) She also testified that she told her maternal grandmother about her father's behavior.[3] (*Id.* at 18-19.)

---

[3] It is somewhat unclear whether she meant to refer to her paternal grandmother both times based on the fact she stated she told "Lupita," which is short for Maria Guadalupe, her paternal grandmother's

Respondent's aunt, Carmen Gerardina Lopez Contreras, testified that during the parties' marriage, she noticed that Respondent was physically hurt on four or five occasions, but that the first two times Respondent covered her injuries with makeup and her long hair and blamed the injuries on accidents.  (Tr. (ECF No. 68) at 53-55.)  The third time Ms. Lopez saw Respondent physically hurt, her temple was injured, and Respondent explained the parties had argued because Petitioner did not like her cooking.  (*Id.* at 55-56.)  The last time Ms. Lopez saw Respondent physically hurt was when Respondent left Petitioner.  (*Id.* at 56, 62.)

Respondent's sister, Laura Gabriela Solis Lopez, stated that during the parties' marriage, she observed Respondent physically hurt approximately ten times.  (Decl. of Laura Gabriela Solis Lopez (ECF No. 74) at ¶ 4.)[4]  She further stated she saw AVES with a "cut/abrasion" to her lip when AVES was approximately six years old and again on the date that Respondent left Petitioner, taking the children with her.  (*Id.* at ¶ 7.)

Petitioner unequivocally denies threatening or abusing Respondent or the children, either physically or psychologically.  (Tr. (ECF No. 67) at 63-73.)  Petitioner testified that from the time the children were born until Respondent left him, he exercised his obligations as a father and took care of the children.  (*Id.* at 45.)  Petitioner provided photographs of the parties, AVES, and another family member in a swimming pool to demonstrate that he exercised his parental rights.  (Pet. Ex. 9 at GMS00014, GMS00060.)

Petitioner contends that Respondent was the abusive parent.  Petitioner testified that Respondent hit AVES on a daily basis, once so hard that her nose bled.  (*Id.* at 76-77.)  Regarding

name.  (Tr. (ECF No. 68) at 18-19.)

---

[4]  Following the evidentiary hearing, Petitioner filed an additional declaration in which he objects to Laura Gabriela Solis Lopez's declaration.  (Errata (ECF No. 71).)  He states that Ms. Solis-Lopez is lying about the abuse she observed because he never physically abused Respondent or AVES.  (*Id.* at ¶¶ 2-4, 6.)  He further states that she had infrequent contact with his family and that as a law student and later as an attorney, she would have known to report the abuse it if had actually happened.  (*Id.* at ¶¶ 2-5.)  Respondent, in turn, objects to Petitioner's additional declaration on the grounds that Petitioner was never disclosed as a rebuttal witness and did not request leave of court to file an additional declaration.  (Objection (ECF No. 70) at 1-3.)  Consistent with its previous evidentiary rulings in this case, the court overrules both parties' objections and will give the evidence the weight it deserves.

1   this incident, Respondent initially called Petitioner at work and said she was scared because AVES

2   had fallen, but when he returned home from work, Respondent admitted that she hit AVES in the

3   head. (*Id.* at 76.)  Petitioner stated that he never saw Respondent hit AVES, but that AVES

4   reported it to him. (*Id.* at 76-77.)

5          Petitioner's mother, Maria Guadalupe Cisneros Novoa, helped with the children frequently

6   and has a different perspective on Respondent and the children's lives.  She testified that the parties

7   lived with her from the time they were married until AVES was approximately one and a half years

8   old. (Tr. (ECF No. 67) at 139.)  She babysat AVES while Respondent was working. (*Id.* at 133-

9   34.)  She stated that she never saw any signs that Respondent was the victim of physical abuse or

10  heard complaints from Respondent that she was mistreated by Petitioner. (*Id.* at 140, 150-52.)  She

11  stated, however, that she saw Respondent hit AVES, drag her by her hair, and verbally abuse her

12  because she did not want to take a bath. (*Id.* at 135-36.)  She further testified that she saw

13  Respondent hit AVES on the head on other occasions. (*Id.* at 136-37.)  Finally, she testified that

14  before AIES was born, Respondent cheated on Petitioner, causing relationship problems for the

15  parties. (*Id.* at 143.)

16         The parties' former neighbor, Aurea Yazmin Castrejon-Salazar, testified that she lived in an

17  apartment that shared a wall with the parties' apartment from January to May of 2014. (Tr. (ECF

18  No. 67) at 112-13, 118.)  She testified that when she saw AVES and her father together, AVES

19  seemed happy. (*Id.* at 113-14.)  She further testified that AVES seemed sad when she was with her

20  mother, that she heard AVES cry when her father would leave for work, and that she heard her

21  mother yelling at and beating AVES. (*Id.* at 114-15.)  She stated that she never heard Petitioner

22  yelling or beating anyone. (*Id.* at 116.)

23         According to Ms. Castrejon-Salazar, she knew the parties only "by sight" during the time

24  they were neighbors, but she later became friends with Petitioner because she sometimes visits his

25  place of employment. (Tr. (ECF No. 67) at 113, 118-19.)  Ms. Castrejon-Salazar testified that she

26  has not had a romantic relationship with Petitioner. (*Id.* at 121, 130.)  However, numerous posts

27  between Petitioner and Ms. Castrejon-Salazar on her Facebook page indicate that they had a

28  romantic relationship. (Ex. I; Tr. (ECF No. 67) at 129 (stating that Ms. Castrejon-Salazar has a

7

1  Facebook page under the name "Salazar Chikita"); Tr. (ECF No. 68) at 139-45 (establishing that

2  Petitioner has a Facebook page under the name "Rulas Hitch Espinosa"); Tr. (ECF No. 68) at 145-

3  51 (translating and describing the Facebook posts).)[5]

4       In the months leading up to the date she left Petitioner, Respondent wrote two letters—one

5  to Petitioner, and another to his mother—expressing her love for Petitioner and her gratitude to her

6  mother-in-law.  Specifically, on August 8, 2014, she wrote a letter to Petitioner stating that he is an

7  "excellent father." (Pet. Ex. 11 at 1-2.)  She expresses her excitement for the upcoming birth of

8  AIES and states that she knows they will be better parents because "we are older more adult a little

9  more mature." (*Id.*)  In the December 31, 2014, letter to Petitioner's mother, Respondent thanked

10  her mother-in-law for the emotional and material support she had given the parties and stated:

11      I was very foolish not to appreciate my family.  To not appreciate my husband.  To
       just see his defects and not his strengths and what he gave me.  To see that this is his
12      way of showing love.  The only thing that I ask now is that if [Petitioner] agrees to
       take me back and that he believes in me, and if there is still love, that we move
13      forward in our marriage and to support him always and also not to bring problems to
       you.

14

15  (*Id.* at 3-4.)  According to Respondent, she does not remember writing the letters, but

16  acknowledged they are in her handwriting. (*Id.* at 51-54.)  Regarding the letter to her husband, she

17  testified that if she wrote it, she "would have done it out of fear because [she] always wanted him

18  to be happy so he would not continue hitting me." (*Id.* at 52.)  Regarding the letter to her mother-

19  in-law, Respondent stated she was feeling regret about cheating on Petitioner. (*Id.* at 85.)

20  Petitioner also presents evidence of an undated Christmas card[6] to Petitioner from Respondent and

21  five handwritten notes from AVES to Petitioner, including a note stating "Daddy I love you very

22  much.  Sorry for leaving but I will be in your heart, handsome Daddy.  I regret this day." (Pet. Ex.

23  12 at 7-8, Ex. 13.)  According to Petitioner's mother, who Petitioner gave the notes for safekeeping,

24

25

26      [5]  Given the evidence of the romantic relationship between Petitioner and Ms. Castrejon-Salazar,
   the court does not give any weight to her testimony.

27

28      [6]  Petitioner's mother states that the undated Christmas card was from December of 2014, the
   month before Respondent left Petitioner. (Decl. of Ms. Cisneros Novoa (ECF No. 64) at ¶ 8.)

1    this note was written on January 31, 2015, which was the date Respondent ultimately left the

2    Petitioner. (Decl. of Maria Guadalupe Cisneros Novoa (ECF No. 64) at ¶¶ 7-8.)[7]  AVES wrote the

3    other notes between June of December of 2014. (*Id.* at ¶ 8.)  Respondent testified that she did not

4    know whether AVES wrote Petitioner a note on the day they left home. (Tr. (ECF No. 69) at 58.)

5         The children lived with both parents in Mexico from the time they were born until January

6    31, 2015, when Respondent left Petitioner, taking the children with her.[8] (Tr. (ECF No. 67) at 14-

7    15; Tr. (ECF No. 69) at 25.)[9]  The day before she left, the couple had argued because Petitioner

8    wanted Respondent "to kill one person" and pressured her to describe to him how she was going to

9    kill that person. (Tr. (ECF No. 69) at 23.)  Respondent stated that Petitioner set a deadline of

10   January 31, 2015, for her to kill someone, and she did not want to become a murderer. (*Id.* at 26.)

11   When AVES tried to intervene in the argument and separate her parents, Petitioner hit AVES,

12   splitting her lip. (*Id.* at 23.)

13        On January 31, 2015, Respondent decided to leave Petitioner because the violence toward

14   her and the children was increasing and because "he finally beat me up so brutally that he left me

15   unconscious and I was bleeding.  And my hand was in bad shape, and my finger, I think it was

16   fractured.  My eye bruised, my lips.  He left me unconscious." (*Id.* at 25-26.)  Respondent testified

17   that this incident occurred in the shower and that she was knocked unconscious with the water

18   running. (*Id.* at 60.)  Respondent woke up because she heard AIES crying. (*Id.* at 25.)  The parties'

19   neighbor subsequently helped free Respondent from behind a door that was locked from the

20

21        [7] Respondent objects to Maria Guadalupe Cisneros Novoa's declaration on the grounds that the

22   evidence Ms. Cisneros Novoa authenticates in the declaration was not timely provided to Respondent,
     among other reasons. (Objection (ECF No. 70) at 3-8.)  The court overrules the objections, and will give

23   appropriate weight to the evidence at issue.

24        [8] Respondent testified that around October or November of 2013, Petitioner took AVES from

25   her for two months. (Tr. (ECF No. 69) at 35.)

26        [9] Petitioner testified that Respondent left him on January 15, 2015. (Tr. (ECF No. 67) at 14-15.)

27   On cross-examination, he stated that the last time he saw the children was on January 30, 2015. (*Id.* at
     53-55.)  Given that the parties do not dispute that this case was filed less than one year after the children

28   were removed from Mexico, the court finds that this date discrepancy is not significant.

1    outside, though it is unclear whether it was the apartment door or a door to a room inside the

2    apartment. (*Id.* at 33.)  The neighbor called a taxi to take Respondent and the children to

3    Respondent's grandmother's house around two or three o'clock in the afternoon. (*Id.* at 31.)

4           Various members of Respondent's immediate and extended family were at her

5    grandmother's house. (Tr. (ECF No. 69) at 37.)  Respondent's aunt, Ms. Lopez, testified that

6    Respondent's "face and her arm and even her finger appeared to be badly hurt.  I even thought that

7    it could be a fracture because she was not able to move her finger and the arm.  It was swollen."

8    (Tr. (ECF No. 68) at 56; Resp.'s Ex. B (photographs of Respondent's injuries).)  According to Ms.

9    Lopez, Respondent could not take care of AIES, such as changing her clothes or diapers, due to the

10   injury to her arm. (Tr. (ECF No. 68) at 65.)  Ms. Lopez took Respondent and the children from

11   Uruapan to her home in Aguascalientes, Mexico. (*Id.* at 72.)  Additionally, Ms. Lopez stated that

12   "AVES also had her mouth broken, split.  And according to what she said, it was because of a slap

13   that her father gave her." (*Id.* at 66.)

14          Ms. Solis-Lopez stated that on the date[10] Respondent left Petitioner, she personally

15   observed both Respondent and AVES in "severe emotional distress" out of fear that Petitioner

16   would kill them. (Decl. Of Laura Gabriela Solis Lopez (ECF No. 74) at ¶¶ 9-11.)  With respect to

17   AVES, she stated this distress was manifested by AVES "cowering down in the car, shaking,

18   crying, and expressing extreme fear that Petitioner would come after her to kill her." (*Id.* at ¶ 9.)

19   She stated that she took the photographs of Respondent's injuries that were admitted into evidence

20   as Respondent's Exhibit B. (*Id.* at ¶ 12.)

21          When Petitioner returned home from work that evening, Respondent and the children were

22   gone. (Tr. ECF No. 67) at 20.)  He had not spoken to Respondent during the workday, and he

23   found Respondent's cell phone, which was turned off, in the apartment. (*Id.* at 20-21.)  Petitioner

24   spoke to Respondent's mother to inquire where they had gone, but she refused to give him any

25   information, even when he said he wanted to know where they were so he could support the

26   _____

27          [10]  Laura Gabriela Solis Lopez's declaration states that Respondent left Petitioner on January 30,
     2015. (ECF No. 65-3 at ¶¶ 7, 8, 11, 12.)  However, Respondent testified that it was on January 31, 2015.
28   (Tr. (ECF No. 69) at 25.)

1   children by sending them money.  (*Id.* at 21-24, 55-56.)

2          After arriving in Aguascalientes, Respondent presented herself to the "DIF," which is a

3   Mexican social service office, seeking protection from Petitioner.  (Tr. (ECF No. 68) at 72-73; Tr.

4   (ECF No. 69) at 38.)  The DIF referred Respondent and AVES to its psychology department for

5   counseling.  (Tr. (ECF No. 68) at 73; Tr. (ECF No. 69) at 38; Resp.'s Ex. H.)  According to

6   Respondent, she initially did not plan to come to the United States, but when Petitioner later

7   learned that she and the children were in Aguascalientes, she decided to apply for asylum in the

8   United States because she was afraid for her life.  (Tr. (ECF No. 69) at 39.)  After Respondent

9   decided she would go to the United States, Respondent asked an attorney at the DIF to prepare

10  documentation regarding the domestic violence to assist Respondent in obtaining asylum in the

11  United States.  (Tr. (ECF No. 67) at 73-74; Tr. (ECF No. 69) at 40; Ex. H.)

12         Over the next several months, Respondent contacted Petitioner by telephone twice.

13  Specifically, in March of 2015, Respondent called him to let him know that she and the children

14  were safe, but refused to let him speak to AVES.  (Tr. (ECF No. 67) at 25-27; Tr. (ECF No. 69) at

15  80-80.)  Based on the area code, Petitioner understood Respondent to be calling from

16  Aguascalientes.  (Tr. (ECF No. 67) at 27.)  On May 13, 2015, the parties' wedding anniversary,

17  Respondent called Petitioner, but refused to allow Petitioner to speak to AVES.  (*Id.* at 29-30.)

18  Respondent has not spoken to his children since January 2015.  (*Id.* at 27.)

19         Respondent and the children left Mexico for the United States on March 17, 2015.  (Tr.

20  (ECF No. 68) at 74-75.)  Respondent and the children traveled by airplane from Aguascalientes to

21  Tijuana, Mexico, where Respondent's cousin, Norma Gaona, picked them up at the airport and

22  took them to the Mexico-United States border so they could apply for political asylum.  (Tr. (ECF

23  No. 67) at 107; Tr. (ECF No. 69) at 79.)  Later, Ms. Gaona picked Respondent and the children in

24  San Diego, California, and brought them to Las Vegas, Nevada.  (Tr. (ECF No. 67) at 107.)  From

25  March 19, 2015, until August of 2015, Respondent and the children lived with Ms. Gaona, and her

26  husband, Leopoldo Gaona, in Las Vegas.  (*Id.* at 84-85.)  Ultimately, Respondent and the children

27  moved out of the Gaonas' home because the Gaonas were divorcing and Ms. Gaona could no

28  longer take care of them.  (*Id.* at 109.)

In April of 2015, while Respondent and the children were living with the Gaonas, Mr. Gaona spoke to Petitioner on the telephone. (*Id.* at 28-29, 101.) Mr. Gaona declined to allow Petitioner to purchase a cell phone for AVES so he could speak to her, or to assist Petitioner in setting up a bank account where he could deposit money for the children. (*Id.* at 28-29, 101, 104-05.) On August 8, 2015, Petitioner confirmed that Respondent and the children were living in Las Vegas, Nevada, based on photographs that Respondent posted on Facebook of her and the children at popular Las Vegas tourist attractions. (*Id.* at 30-31; Tr. (ECF No. 69) at 70-71; Pet.'s Ex. 10.) Later that month, Petitioner filed a petition for return of the children under the Hague Convention with the Mexican Secretary of State's Office. (Tr. (ECF No. 67) at 17-20; Pet.'s Ex. 3.) That month he also filed a custody lawsuit against Respondent in Mexico. (*Id.* at 33-35; Pet's Ex. 4.) According to Petitioner, a custody order has not been entered in that case because the children are not in Mexico. (*Id.* at 37.) However, Petitioner testified that it is his understanding that under the Mexican law principle of *patria potestas*, he has custody rights in his capacity as the children's father. (*Id.* at 37-42, 52.)

Petitioner did not give Respondent permission to take the children from Mexico and bring them to the United States. (*Id.* at 42; Tr. (ECF No. 69) at 72.) He also testified the children do not have visas to enter the United States. (Tr. (ECF No. 67) at 43-45.) In connection with his attempts to secure the children's return to Mexico, Petitioner submitted to a socioeconomic study, a psychological study, and a criminal background check. (*Id.* at 45-47; Pet.'s Exs. 6-8.) Petitioner testified that he has never been arrested and presented a background check letter from the Attorney General's Office for the State of Michoacan indicating that he does not have a criminal record. (*Id.* at 47; Pet.'s Ex. 8.)

Petitioner initiated the case in this court on January 12, 2016. (Mot. for Leave to Proceed *In Forma Pauperis* (ECF No. 1).) After Respondent appeared, the court held a case-management conference and ordered that Respondent must not remove AVES and AIES from Nevada pending the resolution of this case. (Mins. of Proceedings (ECF No. 19).) The court reiterated its order that the children must remain in Nevada pending the resolution of the case at the scheduling conference and again at the evidentiary hearing. (Mins. of Proceedings (ECF No. 25); Tr. (ECF No. 68) at

1 152; Tr. (ECF No. 69) at 96.)

2        After this case was initiated, AVES underwent a psychiatric examination by Respondent's

3 witness Dr. Norman Roitman, whom the parties stipulate is an expert in psychiatry.  (Tr. (ECF No.

4 68) at 101-03; *see also* Resp.'s Exs. C-E.)  Respondent asked Dr. Roitman to form a psychiatric

5 opinion regarding whether AVES is able to give valid testimony and whether she exhibited signs of

6 stress associated with receiving and witnessing abuse by Petitioner.  (Tr. (ECF No. 68) at 101-03.)

7 In addition to examining AVES, Dr. Roitman interviewed Respondent and reviewed the DIF

8 psychologist's report from treatment AVES received in Mexico and treatment logs from counseling

9 AVES received at ABC Therapy in Las Vegas.  (*Id.* at 103-04; Resp.'s Exs. G-H.)  Dr. Roitman

10 prepared a report memorializing his examination of AVES and his review of her records.  (*Id.* at

11 103; Resp.'s Ex. F.)

12        Dr. Roitman testified that AVES is able to discern the difference between a truth and a lie

13 and that she understands the importance of telling the truth in court.  (Tr. (ECF No. 68) at 107.)  He

14 testified that her maturity level is advanced beyond her chronological age by one or two years, to

15 age ten or eleven.  (*Id.* at 108.)  He also testified that AVES has the capacity to form a well-

16 considered opinion and that she was not subject to any undue influence by Respondent in

17 expressing her opinion.  (*Id.* at 108-09.)

18        Based on his evaluation, Dr. Roitman diagnosed AVES with post-traumatic stress disorder

19 ("PTSD") and adjustment disorder with anxiety and depression.  (*Id.* at 109.)  Specifically, he

20 testified as follows:

21        Q. Were you able to reach a diagnosis of [AVES] based on your examination?

22        A. Yes.

23        Q. What was that diagnosis?

24        A. Posttraumatic stress disorder because she fulfilled the criteria under the
          Diagnostic Manual as well as adjustment disorder with anxiety and depression.

25
          Q. What type of signs or symptoms of PTSD did you observe?
26
          A. The manual requires that there be an authentic threat which according to the
27        history that I got there was.  She was within a zone of violence and witnessed
          the—her mother being exposed to that violence and the aftermath of that violence,
28        including specifically a bruising of the eye that she said [sic].  She also was the

13

recipient of an assault resulting in a broken lip.  So the first criteria is— has to judge a circumstance, whether it is actually dangerous.  A person can't just imagine a problem and develop PTSD.  It has to be real.

There is a characteristic imprint of trauma on the psyche of the person who develops PTSD that involves invasive disruptive memories, flashbacks, and nightmares.  These memories are disturbing and contain the emotional elements of the original attack as though it's happening again. She endorsed all three types of invasive reoccurrences and recollections.

Because these imprints, these re-experiencing of the trauma are so disruptive and painful, people avoid anything that might trigger them.  She exhibited avoidance.  She didn't like to talk about it in the first place.  Her affect changed when we did talk about it.  She showed reluctance to talk about it.  All of this was consistent with a direct observation of an event that caused a psychological injury.  In --

Q. So, in your opinion, what was the cause of her PTSD?

A. Being hit and watching her mother being hit.

Q. And, in your opinion, would her PTSD get worse if she was triggered by an event such as returning to her father?

A. Yes.  And I also didn't include in my last response that it was yelling and arguing and loud language which she developed an aversion to.  Other triggers that she would have, not just what I observed in the content, but she will not watch television programs that contain violence.  When there is loudness in her room, she feels like hiding.  She's become skittish and worried.

Q. So what was your conclusion as to [AVES's] fear of returning to Mexico?

A. It would reopen a wound that is best to be closed and healed.

Q. Did you believe her fear to be authentic?

A. Yes.

Q. In your opinion, is she subject to risk of psychological harm if she returns to Mexico?

A. Yes, I would—in my words, I would say additional psychological harm.

(*Id.* at 109-111.)

As for whether AVES could be returned to Mexico and placed in a third party's care, Dr. Roitman stated that AVES "has a close anxious bond with her mother, has separation anxiety that's separate and apart from the PTSD, and separation from her mother could constitute beginning of a—of a significant psychiatric injury."  (*Id.* at 121-22.)  He further testified that separating AVES from her mother could result in "posttraumatic reinjury."  (*Id.* at 125.)  Dr. Roitman did not have an

14

1   opinion, however, as to whether it would cause AVES psychological harm to return to Mexico with

2   her mother, but apart from her father.  (*Id.* at 122.)  He testified, however, that even if AVES is not

3   with her father, AVES still suffers from posttraumatic injury based on her past experiences: "[i]t's

4   not like a hand in a vice that hurts and as soon as the vice is released the person is okay.  This is a

5   residual damage from an experience that now is harbored in her mind and makes her vulnerable to

6   additional psychopathology."  (*Id.* at 125.)

7        Dr. Roitman's assessment of AVES is consistent with the DIF psychologist's report, which

8   states that AVES suffers from "severe psychological and emotional damage as a result of being a

9   victim of domestic violence upon the hands of her father, [Petitioner]."  (Tr. (ECF No. 68) at 113;

10  Ex. H at MSL000005.)  Dr. Roitman acknowledged, however, that the DIF report was prepared to

11  assist Respondent in obtaining asylum in the United States and that the report contains no specifics

12  regarding whether AVES's pathology is a result of physical or emotional abuse, or whether she

13  suffered abuse herself or only witnessed it.  (Tr. (ECF No. 68) at 115-16; Ex. H at MSL000007.)

14  Dr. Roitman's assessment of AVES is also consistent with AVES's records from ABC Therapy in

15  Las Vegas, which state that AVES "displays symptoms of PTSD" like nightmares and feels anxious

16  when she sees her cousins fighting.  (Tr. (ECF No. 68) at 112-13; Ex. G at MSL000045.)

17       Dr. Roitman acknowledged that AVES misses Petitioner.  (Tr. (ECF No. 68) at 119, 131.)

18  Additionally, AVES's records from ABC Therapy state that "[p]atient reported doing good and that

19  she missed her father who lived overseas."  (Ex. G at MSL000045.)  Dr. Roitman explained that

20  the fact AVES misses her father but is scared to go back to him is not unusual.  (Tr. (ECF No. 68)

21  at 137.)  Rather, it authenticates her fear because "it wasn't like she was threatened, you better tell

22  the doctor this and that.  You know, it seemed realistic.  She's attached.  She's bonded.  She's just

23  scared."  (*Id.* at 137.)  Petitioner did not present any evidence as to the psychological impact that a

24  return to Mexico would have on AVES.  Thus, Dr. Roitman's opinons stand uncontroverted and are

25  the only evidence before the court on whether returning AVES to Mexico would cause her PTSD to

26  worsen.

27       Petitioner now seeks the return of AVES and AIES to Mexico for a custody determination

28  by the Mexican courts, arguing that Respondent wrongfully removed and retained the children from

15

Mexico, their habitual place of residence, in violation of his custody rights.  Petitioner argues he never acquiesced or consented to the children's removal from Mexico and that he was exercising his parental rights at the time the children were removed.  Petitioner also seeks attorney's fees and costs under 22 U.S.C. § 9007.[11]

Respondent seeks denial of the petition for return, arguing return of the children to Mexico would expose them to a grave risk of harm psychological and physical harm or place them in an intolerable situation due to domestic violence.  Respondent further argues AVES is of sufficient age and maturity that the court should take account of her objection to returning to Mexico.

## II.    ANALYSIS

The Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention") is intended to "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and . . . to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Hague Convention, art. 1, 19 I.L.M. 1501 (entered into force October 25, 1980).[12]  Both the United States and Mexico are signatories to the Convention.[13]  The United States implemented the Convention through the enactment of the International Child Abductions Remedies Act ("ICARA"), codified as amended at 22 U.S.C. § 9001 *et seq.*

Under Article 12 of the Hague Convention, courts have a duty to determine if a child was wrongfully removed or kept away from his or her habitual residence, and if so, then to order the child returned to that nation for a custody determination.  *See Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010) (stating that "[a] court that receives a petition under the Hague Convention may not

---

[11]  Petitioner cites 42 U.S.C. § 11607 in support of his request for attorney's fees, but this statute was transferred to 22 U.S.C. § 9007.  (Second Am. Pet. (ECF No. 27) at ¶¶ 23-24.)

[12]  The text of the Hague Convention is also available at http://www.hcch.net/e/conventions/text28e.html (last visited December 12, 2016).

[13]  U.S. Department of State, Bureau of Consular Affairs, U.S. Hague Convention Treaty Partners List, https://travel.state.gov/content/childabduction/en/country/hague-party-countries.html (last visited December 12, 2016).

1    resolve the question of who, as between the parents, is best suited to have custody of the child.

2    With a few narrow exceptions, the court must return the abducted child to its country of habitual

3    residence so that the courts of that country can determine custody.")  Removal or retention of a

4    child is wrongful when:

5         a) it is in breach of rights of custody attributed to a person, an institution or any
          other body, either jointly or alone, under the law of the State in which the child was
6         habitually resident immediately before the removal or retention; and

7         b) at the time of removal or retention those rights were actually exercised, either
          jointly or alone, or would have been so exercised but for the removal or retention.

8

9    *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001) (quoting Hague Convention, art. 3).  To

10   establish a claim for return, a petitioner must prove: (1) the child was wrongfully removed or

11   retained, (2) from his or her habitual residence, (3) in violation of the custody rights of the left-

12   behind parent, and (4) the left-behind parent was exercising those rights.  *See id.*

13        The petitioner has the burden of proving by a preponderance of the evidence that "the child

14   has been wrongfully removed or retained within the meaning of the Convention."  22 U.S.C.

15   § 9003(e)(1)(A).  Under § 9003(b), a petition for return of a child is properly heard by "any court

16   which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place

17   where the child is located at the time the petition is filed."  *See also Duarte v. Bardales*, 526 F.3d

18   563, 569 (9th Cir. 2009) (stating that "[a] person seeking the return of a child under the [Hague]

19   Convention may do so by filing a petition in a court where the child is located.").  Under the Hague

20   Convention, children are defined as persons under sixteen years of age.  Hague Convention, art. 4.

21        **A.    Jurisdiction**

22        The Hague Convention is in force between Mexico and the United States.  It is undisputed

23   that the children were physically located in the District of Nevada at the time the petition for return

24   was filed and that AVES and AIES are younger than sixteen years old.  The court therefore finds

25   that it has jurisdiction to determine this case for return under the Convention.  The parties are

26   advised, however, that this recommendation is not a determination of the merits of any custody

27   issues within the meaning of the Hague Convention.  *See Cuellar*, 596 F.3d at 508.

28   */ / /*

17

**B.      Case-in-Chief for Return**

The parties do not dispute that Mexico was the children's habitual residence at the time Respondent removed them to Las Vegas in March of 2015.  Additionally, the facts in the record demonstrate that until the children were removed to Las Vegas, they had lived in Mexico for their entire life.  The court therefore finds that Mexico was the children's habitual residence at the time they were removed to the United States.

Regarding custody rights, Petitioner argues that the children's removal was in contravention of Articles 367 and 373 of the Civil Code of the State of Michoacan.  Petitioner contends that these statutes provide that parental authority is to be exercised by the father and the mother and that as long as the child is under parental authority, the child must not be taken from the residence of those exerting parental authority without their permission.  At the evidentiary hearing, the court took judicial notice of a certified copy of Articles 367 and 373 of the Civil Code of the State of Michoacan that were translated into English, subject to the court doing its own research regarding Mexican law.[14]  (Tr. (ECF No. 67) at 42; Pet.'s Ex. 5.)   Petitioner argues he never acquiesced or consented to the children's removal from Mexico and that he was exercising his parental rights at the time they were removed from Mexico.

Respondent contends that Petitioner failed to present sufficient evidence regarding the applicable Mexican law establishing he has custody rights over the children.  Specifically, Respondent argues that at the evidentiary hearing, Petitioner denied he was relying on Articles 367 and 373 and stated that the law recently had changed.  (*See* Tr. (ECF No. 67) at 39.)  Respondent further argues that Petitioner does not prove that the copy of Articles 367 and 373 he provided to the court are the current law.  Respondent therefore argues Petitioner has failed to establish this

---

[14]  At the hearing, Petitioner's attorney represented to the court that certified copy in English was provided to her by the United States Department of State.  (Tr. (ECF No. 67) at 40-41.)  Petitioner did not provide the original Spanish version of the statutes to the court.  The document Petitioner provided states that under Article 367, "[p]arental authority/responsibility (*patria potestas*) over the children will be asserted . . . [b]y the father and the mother."  Article 373 states that "[a]s long as the child is under parental authority/responsibility (*patria potestas*), he or she shall not leave the residence of those who exert it without their permission or by order emitted by an authority legally qualified to do so."

18

1  element of his prima facie case.

2      The court conducted independent research regarding Mexican law and was unable to

3  confirm that the English translation of Articles 367 and 373 that Petitioner provided to the court are

4  the current law.[15]   Regardless, the court finds that Petitioner has custodial rights to the children

5  under the Mexican law doctrine of *patria potestas*.  *See, e.g., Gonzales v. Gutierrez*, 311 F.3d 942,

6  954 (9th Cir. 2002) (explaining that the "concept of *patria potestas* is derived from Roman law and

7  originally meant paternal power over the family and household" but holding that Mexico's doctrine

8  of *patria potestas* "does not confer rights of custody upon the noncustodial parent where a

9  competent Mexican court has already decided the rights and obligations of both parents"),

10  *overruled on other grounds*, *Abbott v. Abbott*, 130 S. Ct. 1983, 1986 (2010); *Gonzalez v. Pena*, ---

11  F. Supp. 3d---, 2016 WL 3654283, at *3 (D. Ariz. July 8, 2016) (finding that the Mexican law

12  doctrine of *patria potestas* was sufficient to establish custodial rights of unmarried parents under

13  the Hague Convention when there were no court orders dictating parenting time); *Aguilera v. De*

14  *Lara*, No. CV14-1209-PHX-DGC, 2014 WL 3427548, at *2 n.1 (D. Ariz. July 15, 2014) (stating

15  that "custody rights under Mexican law, referred to as 'patria potestas' recognize a parent's right to

16  care for the child, reside with the child, and provide for the child's necessities. The rights belong to

17  both parents.").

18      Here, it is undisputed that Petitioner is the children's father, and he is listed as their father

19  on their birth certificates.  (Pet.'s Ex. 1.)  It is further undisputed that Petitioner and Respondent

20  were married at the time of the children's births.  (Pet.'s Ex. 2.)  Additionally, the facts in the

21  record demonstrate that the parties shared custody of the children in their capacity as a married,

22  cohabitating couple.  The parties testified consistently that until January of 2015 when Respondent

23

24      [15]  Specifically, the court obtained the current Civil Code for the State of Michoacan (Código

25  Civil Para el Estado de Michoacán de Ocampo) and the current Family Code for the State of Michoacan
   (Código Familiar Para El Estado de Michoacán de Ocampo) at

26  http://celem.michoacan.gob.mx/morelia/principal.jsp (last visited December 7, 2016) and
   http://www.poderjudicialmichoacan.gob.mx/web/institucion/normatividad.aspx (last visited December

27  7, 2016).  The court cross-referenced Articles 367 and 373 in both codes, and neither appear to

28  correspond to the English translation of Articles 367 and 373 provided by Petitioner.

1    left Petitioner, the children had lived with both parents for their entire lives, with the exception of

2    the two-month period in October or November of 2013 when Petitioner took AVES from

3    Respondent.  There is no evidence in the record indicating that a Mexican court has entered any

4    orders terminating or limiting Petitioner's custody rights.  The court therefore finds that Petitioner

5    had custody rights under Mexican law.

6         Petitioner presented ample evidence that was exercising his custody rights at the time of

7    removal.  He testified that he cared for the children from the time they were born until January of

8    2015 when Respondent left him.  The court admitted into evidence two family photographs

9    showing Petitioner interacting with AVES in Mexico.  (Pet.'s Ex. 9 at GMS00014, GMS00060.)

10    Petitioner testified that he attempted to continue to provide financial support to the children after

11    Respondent left him.  Specifically, he contacted Respondent's mother to find out where the

12    children were so he could send money to them.  When the children were in Las Vegas, he spoke to

13    Mr. Gaona and requested to set up a bank account to send money to the children and asked to

14    purchase a cellular telephone for AVES so that he could speak to her.  After Respondent left him,

15    Petitioner attempted to speak to AVES on the telephone on multiple occassions but Respondent

16    prevented him from doing so.  Respondent conceded that she has not allowed Petitioner to speak to

17    AVES.  Based on the evidence, it appears that Petitioner would have continued to exercise his

18    custody rights if Respondent had not left him and taken the children to the United States.  The court

19    therefore finds that Petitioner was exercising his custody rights under Mexican law when AVES

20    and AIES were removed to the United States.

21         Finally, Petitioner testified that the children were removed from Mexico without his

22    knowledge or consent, preventing Petitioner from exercising his custody rights.  Respondent

23    acknowledged that she did not have his permission to bring the children to the United States.  The

24    court therefore finds that Respondent wrongfully removed AVES and AIES to the United States

25    and retained them here in violation of Petitioner's custody rights under Mexican law.  Having

26    weighed all of the evidence, the court finds that Petitioner has established by a preponderance of

27    the evidence each element of his claim for the return of the children to Mexico.

28    ///

### C.  Grave-Risk Defense

Respondent seeks denial of the petition for return, arguing return of the children to Mexico would expose them to a grave risk of harm due to domestic violence.  Respondent argues the evidence demonstrates there was a long history of psychological and physical abuse by Petitioner directed at Respondent and the children, including death threats, and that the abuse was escalating. Respondent further argues that while the case involves some physical abuse of AVES, the magnitude of the psychological abuse she suffered is unique.  Specifically, she argues AVES witnessed the verbal and physical abuse of her mother, but was also forced to engage in physical abuse of her mother, and was threatened with death.  Respondent argues Dr. Roitman's uncontested opinion that returning AVES to her father in Mexico would present a severe risk of additional psychological harm given her PTSD diagnosis demonstrates that returning her to Mexico would expose her to a grave risk or place her in an intolerable situation.  Respondent argues that if forced to return to Mexico, AIES would be subject to the same psychological consequence as AVES.

According to Respondent, her testimony and AVES's testimony were corroborated by her aunt, Ms. Lopez, and her sister, Ms. Solis-Lopez, as well as the photographic proof of the physical abuse to Respondent.  (Resp.'s Ex. B.)  Respondent further argues that domestic violence directed against her supports a finding of grave risk and that the court must consider spousal abuse in making the grave-risk determination given the potential that the abuser will abuse the children, either physically or emotionally.  Finally, Respondent argues that the children's safety is of paramount concern and that given the escalating nature of the abuse, there is not an undertaking or condition that will give the children adequate protection against the Petitioner in Mexico. Respondent contends that the fact Mexico may have legal or child protective services designed to address domestic violence does not, by itself, demonstrate that AVES and AIES would receive sufficient protection if returned.

Petitioner argues Respondent fails to prove the grave-risk defense by clear and convincing evidence.  Petitioner argues there is limited evidence of physical abuse to AVES and AIES and that any violence toward Respondent is irrelevant.  To the extent Petitioner struck AVES, Petitioner argues it was because she was misbehaving at his place of work and because she needed to be

1    disciplined after refusing to sleep in her own bedroom.  Petitioner contends that this discipline does
2    not establish a grave risk of harm by clear and convincing evidence.

3            Petitioner further argues that Respondent's aunt, Ms. Lopez, never witnessed the abuse and
4    embellished her testimony to such an extent that it is not credible and therefore should be given no
5    weight.  In contrast, Petitioner argues that his mother testified she never witnessed or heard of any
6    abuse despite the fact she spent a significant amount of time with the family.  Petitioner argues that
7    if Respondent had filed a police report in 2013, the police would have arrested Petitioner because
8    Mexico has laws to protect victims of domestic violence.  However, Petitioner argues he has never
9    been arrested and does not have a police record.  Petitioner also argues that the two letters
10   Respondent wrote in August and December of 2014—in which she praises her husband and
11   mother-in-law in loving terms and accepts responsibility for her own actions, but does not mention
12   any abuse—demonstrate that the abuse did not occur.

13           Finally, Petitioner argues that even if the court finds that Respondent established the grave-
14   risk defense, the court must consider whether a reasonable remedy can be fashioned that would
15   permit AVES and AIES to return to Mexico for a custody determination while avoiding any risk of
16   harm that would result from living with Petitioner.  Petitioner represents to the court that if the
17   court orders that the children be returned to Mexico, Silvia Romero Guzman, Chief of the
18   Protection Department of the Mexican Consulate in Las Vegas, Nevada, will escort the children
19   from Las Vegas to the DIF office in Uruapan where they will remain pending further order of the
20   appropriate Mexican court.  Petitioner contends that this remedy would further the Hague
21   Convention's goal of eliminating any tactical advantages gained by absconding with a child.

22           Article 13 of the Hague Convention provides certain narrow exceptions to Article 12's
23   mandate that a child who was wrongfully removed must be returned to his or her habitual
24   residence.  Return is not required if "there is a grave risk that his or her return would expose the
25   child to physical or psychological harm or otherwise place the child in an intolerable situation."
26   Hague Convention, art. 13(b).  A grave risk defense must be established by clear and convincing
27   evidence.  22 U.S.C. § 9003(e)(2)(A) ("[i]n the case of an action for the return of a child, a
28   respondent who opposes the return of the child has the burden of establishing . . . by clear and

22

1    convincing evidence that one of the exceptions set forth in Article 13b or 20 of the Convention

2    applies."). Courts have uniformly acknowledged that defenses available under the Hague

3    Convention must be interpreted narrowly. *Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir.

4    2009). Even if a grave risk defense is established, the court is not required to deny the petition for

5    return, and may exercise its discretion to order the child returned. *Id.*

6        The grave-risk exception requires the court to consider "whether the child would suffer

7    serious abuse that is a great deal more than minimal." *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th

8    Cir. 2005) (quotations omitted). "The risk must be grave, not merely serious." *Id.* at 1036

9    (quotation omitted). The grave-risk exception applies "only in extreme cases" and does not allow

10   the court to make value judgments regarding disparate economic conditions, lifestyles, or parenting

11   styles and "is not license for a court in the abducted-to country to speculate on where the child

12   would be happiest." *Cuellar*, 596 F.3d at 508-09 ("Billions of people live in circumstances similar

13   to those described by [the father]. If that amounted to a grave risk of harm, parents in more

14   developed countries would have unchecked power to abduct children from countries with a lower

15   standard of living."). Proof of grave risk of harm requires "specific evidence of potential harm" to

16   children. *Rydder v. Rydder*, 49 F.3d 369 (8th Cir. 1995).

17       Given that the Hague Convention provides a short-term remedy to permit long-term custody

18   proceedings to take place, the grave-risk inquiry should be limited to the degree of harm that the

19   children would suffer in the immediate future, which is the "period necessary to obtain a custody

20   determination." *Gaudin*, 415 F.3d at 1037. "[B]efore denying the return of a child because of a

21   grave risk of harm, a court must consider alternative remedies that would allow both the return of

22   the children to their home country and their protection from harm." *Id.* at 1035.

23       Although the Ninth Circuit has not ruled on the issue, various other courts have considered

24   spousal abuse in the determination of whether the grave-risk exception under Article 13(b) applies.

25   Specifically, spousal abuse "is a factor to be considered in the determination of whether or not the

26   Article 13(b) exception applies because of the potential that the abuser will also abuse the child."

27   *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1058-59 (E.D. Wash. 2001) (analyzing

28   *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) (reversing order of return where father was

psychologically abusive and had severely beaten the children's mother in their presence)); *see also Simcox v. Simcox*, 511 F.3d 594 at 607-08 (6th Cir. 2007) (upholding finding that a grave risk of harm to children existed where father verbally and physically abused the children's mother in their presence, combined with "frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and pulling of [the children's] hair and ears."); *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (reversing order of return where the father had beaten the mother severely and repeatedly in front of the children).

Here, the parties presented contrasting evidence regarding Petitioner and Respondent's general character, temperament, and fitness to be parents over their nine-year relationship. This included testimony that Petitioner is controlling, jealous, and a disciplinarian and that Respondent was unfaithful to Petitioner, did not breast feed AVES, and was fired from jobs for stealing. Most of this evidence goes to the parties' fitness as parents or spouses, a subject that the court may not decide in this case. The court therefore disregards this evidence.

Respondent presented evidence of domestic violence directed at her by Petitioner over the course of their nine-year relationship, including physical and emotional abuse. Based on Respondent's testimony and the final beating in the shower—which was the precipitating event that prompted Respondent to leave Petitioner and is documented with photographic evidence—it appears the violence was escalating. Respondent also testified that Petitioner threatened to kill her and the children. Respondent's testimony is corroborated by AVES, who Dr. Roitman opined is able to distinguish between a truth and a falsehood and is capable of articulating herself in court. Although Petitioner testified that he never physically harmed Respondent, given the photographic evidence and testimony to the contrary by Respondent, AVES, Ms. Lopez, and Ms. Solis-Lopez, the court finds Petitioner's testimony that he did not abuse Respondent is not credible.

There is some evidence of physical abuse against AVES, though based on her testimony, it was limited to three or four incidents. Petitioner unequivocally denies hurting his daughters and characterizes these incidents as isolated incidents of discipline when AVES was acting up at her father's place of work or refusing to sleep in her own bed. This characterization is not fully supported by the evidence in the record, however, which indicates that the last time Petitioner hit

1 | AVES, splitting her lip, it was because she tried to intervene in a fight between her parents that

2 | occurred on January 30, 2015.  AVES's testimony regarding the physical abuse is corroborated by

3 | Respondent and Respondent's sister, Ms. Solis-Lopez, whose declaration states that she personally

4 | saw AVES with an injured lip twice.  Additionally, Ms. Lopez testified that when Respondent left

5 | Petitioner, AVES had a split lip.

6 |       Respondent presented uncontroverted evidence that Petitioner caused significant

7 | psychological harm to AVES, as well as specific evidence of potential harm that AVES would

8 | suffer if she returns to Mexico.  According to Dr. Roitman, AVES suffers from PTSD, which was

9 | caused by "[b]eing hit and watching her mother being hit."  (Tr. (ECF No. 68) at 110.)

10 | Specifically, Dr. Roitman testified that AVES "was within a zone of violence and witnessed

11 | the—her mother being exposed to that violence and the aftermath of that violence, including

12 | specifically a bruising of the eye that she said [sic].  She also was the recipient of an assault

13 | resulting in a broken lip."  (*Id.* at 109.)  He further testified that due to the trauma she experienced,

14 | AVES experiences "invasive disruptive memories, flashbacks, and nightmares."  (*Id.* at 110.)

15 | Additionally, AVES exhibits avoidance of triggers that might cause her to re-experience trauma,

16 | such as yelling, arguing, or watching television programs that contain violence.  (*Id.*)  These

17 | triggers make AVES feel like hiding and make her "skittish and worried."  (*Id.*)  Dr. Roitman

18 | testified that her PTSD would get worse if she was returned to Petitioner in Mexico.  (*Id.* at 110-

19 | 11.)  He further testified that AVES has an authentic fear of returning to Mexico and that if she

20 | returns, "[i]t would reopen a wound that is best left closed and healed" and that it would subject her

21 | to "additional psychological harm."  (*Id.* at 111.)  Thus, Dr. Roitman concluded AVES should not

22 | be returned to her father.  (*Id.* at 111, 121.)  Based on Dr. Roitman's uncontroverted expert opinion

23 | testimony, the court finds there is a grave risk that return would subject AVES to psychological

24 | harm.

25 |       In addition to Dr. Roitman's testimony that returning AVES to Mexico would result in

26 | additional psychological harm, there is evidence that returning her to Mexico would expose her to

27 | grave risk of physical harm due to escalating domestic abuse.  There is evidence that the day before

28 | Respondent left home with the children, Petitioner hit AVES in the face, causing her lip to split,

1    and that Petitioner threatened to kill both of the children.  The court therefore finds that in addition

2    to the risk of psychological harm, there is a grave risk that return would expose AVES to physical

3    harm.

4         The court has considered whether the risk of psychological harm to AVES "can be

5    minimized or eliminated through some alternative remedy." *Gaudin*, 415 F.3d at 1037.  Although

6    Petitioner argues the children should be returned to Mexico and placed in the custody of the

7    Mexican social services pending a custody determination by the Mexican courts, this proposed

8    remedy does not address Dr. Roitman's uncontested testimony indicating that AVES possesses an

9    authentic fear of Petitioner and that returning her to Mexico would cause her PTSD to worsen, even

10   if she is not in Petitioner's custody.  Specifically, Dr. Roitman stated that even if AVES is not with

11   her father, AVES still suffers from posttraumatic injury based on her past experiences: "[i]t's not

12   like a hand in a vice that hurts and as soon as the vice is released the person is okay.  This is a

13   residual damage from an experience that now is harbored in her mind and makes her vulnerable to

14   additional psychopathology." (*Id.* at 125.)  While the court is cognizant that the grave-risk inquiry

15   "should be concerned only with the degree of harm that could occur in the immediate future,"

16   *Gaudin*, 415 F.3d at 1037, Dr. Roitman's uncontested opinion that returning AVES to Mexico will

17   result in certain additional psychological harm was not qualified with specific time parameters for

18   how long she would have to be in Mexico for the harm to occur.

19        Additionally, Dr. Roitman testified that returning AVES to Mexico and placing her in a

20   third party's care "could constitute beginning of a—of a significant psychiatric injury" given

21   AVES's separation anxiety.  (*Id.* at 121-22.)  He further testified that separating AVES from her

22   mother could result in "posttraumatic reinjury." (*Id.* at 125.)  The court is cognizant that it must not

23   allow "an abducting parent to profit from the psychological dislocation that he has caused."

24   *Cuellar*, 596 F.3d at 511.  Regardless of AVES's attachment to her mother, given Dr. Roitman's

25   testimony that returning AVES to Mexico will exacerbate her PTSD that was caused by being hit

26   and watching her mother be hit, the court finds it cannot return AVES to Mexico in the custody of a

27   third party without subjecting her to a grave risk of psychological harm.

28   / / /

26

1   Neither party argues the children should be returned to Mexico in Respondent's custody,

2   and Dr. Roitman did not express an opinion on this issue.  Nor do the parties present argument or

3   authority indicating that the court has authority to compel Respondent to return to Mexico with her

4   children.  Regardless, the court has considered the possibility of requiring the children to return to

5   Mexico in Respondent's custody, but finds that in light of Dr. Roitman's uncontested testimony

6   that returning AVES to Mexico would cause her PTSD to worsen, even if she is not in Petitioner's

7   custody, it would be impossible to return AVES to Mexico under any circumstances without

8   placing her at grave risk of psychological harm.

9   Although the parties did not present any evidence regarding the arrangements that the

10  Mexican authorities are willing to take to accommodate return of the children, Petitioner's attorney

11  represents that if the court orders that the children be returned to Mexico, Silvia Romero Guzman,

12  Chief of the Protection Department of the Mexican Consulate in Las Vegas, Nevada, will escort the

13  children from Las Vegas to the DIF office in Uruapan where they will remain pending further order

14  of the appropriate Mexican court.  Thus, it appears the Mexican authorities are willing and able to

15  make accommodations to facilitate return.  Regardless, there is no evidence that the Mexican

16  authorities can ensure that a return to Mexico would not trigger a recurrence of AVES's PTSD,

17  which is an "impossible task."  *See Blondin v. Dubois*, 238 F.3d 153, 162-63 (2d Cir. 2001)

18  (affirming a district court's finding, on the basis of uncontested expert testimony, that a grave risk

19  of psychological harm "encompasses an almost certain recurrence of traumatic stress disorder."

20  (quotation omitted)).

21  In sum, this is not a case where AVES has an attachment to her new home in the United

22  States, enjoys better living conditions or opportunities than she would in Mexico, or would

23  experience adjustment problems attendant to relocation.  This is a case in which the uncontested

24  expert testimony demonstrates that AVES faces a real risk of suffering additional psychological

25  harm if she is returned to Mexico, in addition to other evidence indicating she is at risk of suffering

26  physical harm if she is returned.  The court therefore finds that there is clear and convincing

27  evidence that returning AVES to Mexico would pose a grave risk to her psychological and physical

28  well-being or constitute an intolerable situation for her.  Given that Respondent has established the

grave-risk defense by clear and convincing evidence as to AVES, the court will recommend that the second amended petition be denied as to AIES as well. *See Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 556 (E.D. Pa. 2010) (declining to separate siblings and finding that the younger sibling who was not suffering from PTSD would be exposed to the same grave risk of harm as the older sibling suffering from PTSD). Further, given that Respondent has established the grave-risk defense by clear and convincing evidence, the court does not express an opinion as to whether AVES is of sufficient age and maturity that her objection to returning to Mexico should be credited.

### D.    Conclusion

Having weighed all of the evidence, the court finds that Petitioner met his burden of establishing his case-in-chief for the return of AVES and AIES by a preponderance of the evidence. Given the clear and convincing evidence of physical and psychological abuse, however, the court finds that returning the children to Mexico would pose a grave risk to their physical and psychological well-being. The court therefore will recommend that the second amended petition for return be denied. The court does not express an opinion on the mature child objection. Given that the court is not recommending the return of the children to Mexico, the court further will recommend that Petitioner's request for attorney's fees and costs under ICARA be denied.

The court emphasizes that under the Hague Convention, if this report and recommendation is adopted by the assigned United States district judge, it will have the limited effect of authorizing custody proceedings in the United States, and it establishes that AVES and AIES will remain where they are living in the meantime. The final determination of where AVES and AIES will live in the future, and in whose custody, will be resolved through state custody proceedings, not this case. Finally, Respondent is advised that the court's previous orders that Respondent must not remove AVES and AIES from the District of Nevada pending the final outcome of this case remain in effect.

## III.    RECOMMENDATION AND ORDER

IT IS THEREFORE RECOMMENDED that the court DENY Petitioner Luis Raul Espinosa-Cisneros's Second Amended Petition for Return of Children to Petitioner (ECF No. 27), including Petitioner's request for attorney's fees and costs.

1    IT IS ORDERED that Respondent must not remove AVES and AIES from the District of

2    Nevada pending the final resolution of this case.

3    **IV.    NOTICE**

4    This report and recommendation is submitted to the United States district judge assigned to

5    this case under 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation may

6    file a written objection supported by points and authorities within fourteen days of being served

7    with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may

8    waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir.

9    1991).

11    DATED: December 14, 2016

13    _____

14    **C.W. Hoffman, Jr.**
      **United States Magistrate Judge**

29